## HARVEY v. STOWE.

(Circuit Court of Appeals, Ninth Circuit.   November 18, 1914.)

### No. 2401.

1. CORPORATIONS ⬦125—TRANSFER OF STOCK—NECESSITY OF REGISTRATION.

Registration of a transfer of stock on the books of the corporation is not essential to a valid transfer of title, and an indorsement and delivery of the certificates of stock, with continued possession thereafter by the transferee, is sufficient under Civ. Code Cal. § 3440, which makes a transfer of personal property invalid as against creditors unless accompanied by an immediate delivery and followed by a continued change of possession.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 470–473, 477; Dec. Dig. ⬦125.]

2. CORPORATIONS ⬦125—TRANSFER OF STOCK—VALIDITY—CONTINUED POSSESSION BY TRANSFEREE.

Where a husband indorsed certificates of stock in a corporation issued in his name and delivered the same as a gift to his wife, who retained possession of them during several years, except on two occasions when she redelivered them to her husband for temporary purposes, after which they were returned to her, such temporary redelivery did not break her continuity of possession so as to invalidate the transfer under Civ. Code Cal. § 3440, which requires a continued change of possession.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 470–473, 477; Dec. Dig. ⬦125.]

3. BANKRUPTCY ⬦303—GIFT FROM BANKRUPT TO HIS WIFE—VALIDITY.

Evidence considered, and *held* to sustain the claim of a bankrupt's wife to the ownership of stock, which was transferred from his name to hers on the books of the corporation when he was insolvent, on the ground that the certificates were indorsed and delivered to her as a gift several years before, when they were first issued, and when he was solvent, and that she retained possession of them at all times thereafter and kept them in a private safe to which he did not have access.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. ⬦303.]

Appeal from and in Error to the District Court of the United States for the Northern District of California; E. S. Farrington, Judge.

Suit by B. S. Stowe, as trustee in bankruptcy of J. Downey Harvey, against S. G. Harvey. Decree for complainant, and defendant appeals and brings error. Reversed.

---

Charles S. Wheeler and John F. Bowie, both of San Francisco, Cal., for appellant and plaintiff in error.

Bert Schlesinger, E. H. Williams, and A. E. Shaw, all of San Francisco, Cal., for appellee and defendant in error.

Before GILBERT, Circuit Judge, and WOLVERTON and VAN FLEET, District Judges.

WOLVERTON, District Judge.   J. Downey Harvey, having been adjudged a bankrupt by involuntary proceedings, B. S. Stowe was, on November 17, 1911, duly elected trustee of his estate, and subsequently qualified as such.   On January 11, 1912, the trustee instituted a suit in equity against Harvey and S. G. Harvey, his wife, to set aside a transfer previously made by Harvey to his wife of 546 shares of the capital stock of the Shore Line Investment Company, claiming said stock to be an asset of Harvey's estate.

The complaint avers that Harvey gave the stock to his wife on the 26th day of November, 1909, and at the time was insolvent, and that the gift was without consideration, fraudulent, and inoperative as to his creditors.

Mrs. Harvey answers denying that a gift was made to her of the stock on the date stated, but affirms that Harvey, in consideration of natural love and affection, gave her 300 shares of such stock on or about June 26, 1905, 66 shares on or about August 29, 1905, and the remaining 180 shares on or about September 25, 1905, and indorsed and delivered to her the certificates representing such shares when the gift thereof was made; that at the time stated Harvey was solvent and able to pay his debts from his own means; and that his assets taken at a fair valuation were sufficient in amount to pay his just debts and liabilities.

That Harvey was wholly solvent during the year 1905 and for two years or more thereafter there can be no dispute, and that he was insolvent on November 26, 1909, is admitted.

Mrs. Harvey, claiming to have deraigned title from her husband, the common source, has the burden of establishing it in herself.   This depends upon whether the gift of the stock was made to her, as she alleges, and at the time or approximately the time stated, and upon the good faith attending the transaction.   If the stock was given or transferred at the time as averred by plaintiff, then it is utterly without legal effect and void as to the creditors of Harvey's estate.

The Shore Line Investment Company was organized in May or June, 1905.   J. Downey Harvey was chosen one of its directors, and on January 3, 1906, he was also elected president, and since held these positions up to the time he became a bankrupt.   Prior to the incorporation of this company, Harvey testifies that he, in company with his wife and others, visited certain lands which were to become the property of the corporation, and its principal holdings, and, continuing, he says:

"I told her at that time that I was going to give her my stock that I would acquire in that land company.  After the acquisition of the land, and the organization of the company, the stock was issued to me in June, 1905, one lot, another lot in August, 1905, and two lots in September, 1905.  Stock

certificates were issued to me, and when I received them I indorsed them and gave them to Mrs. Harvey in conformity to what I told her I was going to do. I took them and handed them to her and told her that they were the certificates of the Shore Line Investment Company that she was interested in as I had promised her, and I told her to keep them and take care of them, that they were of value, and that they were indorsed. And I said to her that the reason I am retaining them in my name is that I am very largely interested in the Ocean Shore Railroad, and these two companies are associated in the development of one another; one depends upon the success of the other. If I keep this stock in my name, which I will want to do, I will show the people that the Ocean Shore Railroad is interested in the success of this land company, and that I am a large holder in it, and that at all times I will be ready to help out the Granada as much as we can. * * *

"In April, 1907, I paid a $10 assessment on that stock. I had no conversation with Mrs. Harvey in regard to the assessment. Mrs. Harvey was East with one of my daughters, and I wrote her the assessment had been levied and that when she returned I would get the stock and have the receipt entered on it. When she returned I did get the stock. I did not say anything to her regarding whether or not I would pay the assessment. When I gave her the stock no assessment was contemplated, and I naturally felt that, since I had given her a gift at that time, I ought to follow it up and pay the obligations that would fall on it. I did pay the assessment and wrote her to that effect to New York when she was there. My intent in paying the assessment was to make an additional gift which would naturally follow this present of stock. I told her if I acquired more stock I would give it to her, and I felt it my duty to take care of the assessment and make a gift of it, as I had of the certificates themselves. The total paid by me for the stock, including the assessment, was $23,000 and some odd dollars, I think $650, or something like that."

The stock, as Harvey affirms, has been in her possession ever since, except at one time, at his request, she delivered to him a block of 66 shares which he had put in the name of one J. A. Folger in order to qualify him to act as a director of the company. As to this he says:

"It was in December, 1906, that I first got this stock from Mrs. Harvey. It was transferred from my name unto that of J. A. Folger, where it remained until December, 1907, when it was retransferred into my name and was indorsed and delivered to Mrs. Harvey by me. Mrs. Harvey had Mr. Folger's certificate indorsed by him. The transfers were attended to by me. I got the certificate on each occasion from Mrs. Harvey and took it to the secretary and returned it to her. There was no other transfer of this stock between the time that I gave it to Mrs. Harvey and its actual transfer in November, 1909. At that time I had the stock in my possession; that is, I did not have it in my possession except for that purpose."

And at another time, when the company was negotiating for a loan, being early in November, 1909, it was contemplated that the stockholders would be required to sign an agreement pledging themselves with their stock to meet the obligations. Of this Harvey testifies:

"I was then notified by the general manager that it would be necessary for me to produce these certificates of stock, as he wanted to see how much stock he could acquire for this purpose. * * * I got the stock from Mrs. Harvey and turned it over to Mr. Fay, general manager of the Shore Line Investment Company, who was negotiating for the loan. * * * I gave this stock to Mr. Fay. They were in my name, but had my indorsement on them. I received them back from Mr. Fay around the 26th of November, or a little before. As negotiations were still going on, and the same obligation would be insisted upon by any bank making a loan, I had the stock transferred to Mrs. Harvey's name.

"I receipted for the stock, but Mr. Corbet said: 'I will have to have Mrs. Harvey's receipt. I will give you a receipt.' He dictated one to his stenographer, which he handed to me, and which I took or sent to Mrs. Harvey. This was returned to me and the certificates were given to Mrs. Harvey later. The negotiations for the loans kept up until some time in December. On December 9th we levied an assessment. We did not make the loan, because our payments commenced to come in and we were able to discharge our obligations and collect sufficient money to satisfy our creditors. It was while these negotiations were pending that I had the stock transferred to Mrs. Harvey's name. At the conclusion of the negotiations I sent the stock to Mrs. Harvey. I either sent the stock to Mrs. Harvey, or took it down to her myself to Del Monte. I have never had the certificates in my possession, except as I have testified here, from the time they were first delivered until this action was commenced."

On cross-examination Harvey further said:

"The reason that I did not have these shares of stock transferred to Mrs. Harvey in 1905 was, as I have testified, that we had just formed these two companies, and the Shore Line Investment Company depended upon the building of the Ocean Shore Railroad. I was the largest stockholder in both companies, and thought that my association and prominence would help the Shore Line Investment Company. There was a great deal of rivalry down that way as to this land business, and, if we could make an association between the two, it would make the people who purchased at Granada feel that they were going to get a good railroad service, and, if there was any favoritism or help to be had from the association with the railroad, we wanted to get it. If I was not connected with the Shore Line Investment Company, its position would be just the same as the other companies not associated with the railroad. * * * It afterwards turned out to be of immense benefit that I retained my identity as a stockholder in the Shore Line Investment Company. As a matter of fact, the men who furnished the money to build the Ocean Shore Railway Company put up the money to finance the Shore Line Investment Company.

"There was a close connection between the two companies through the people who formed them. There was no money connection between the two companies. The original stockholders were the same."

Mrs. Harvey first gave her testimony before the referee in bankruptcy. On the subject of the gift she says:

"In 1905 Mr. Harvey told me he was going to give me some stock in the Shore Line Investment Company, and he gave me in June of that year 300 shares. He told me as he acquired more he would give it to me. The reason that he kept the shares in his own name was because he was a big holder in the Ocean Shore Railway Company and that would show his interest in the Shore Line Investment Company if he kept them in his name. In August he gave me 66 shares. In September he gave me 160 shares and 20 shares, and I put them in my box. In 1906 Mr. Harvey asked me for the certificate for 66 shares in order to make Mr. Folger a director of the company. In 1907, Mr. Harvey wrote me—I was then in New York—there was an assessment on the Shore Line Investment Company of $10 which he paid, and when I returned in July I gave him the certificates and he had the assessments indorsed on them. In December, Mr. Folger went out of the directorship of the Shore Line Investment Company and I got the certificate indorsed by Mr. Folger and gave it to Mr. Harvey. He gave me another one indorsed by himself and I put it in my box. Mr. Harvey gave me the stock in the respective months that I have named in 1905; I mean by that he gave me the certificates, and they were indorsed by Mr. Harvey. I put the certificates in the safe deposit of the First National Bank, where I always have a box. I remember the dates on which these certificates were given me, because I put them down on a memorandum. * * *

"In December, 1906, Mr. Harvey stated he wanted the stock certificate for 66 shares to make Mr. Folger a director. I went to my box and got the certificate and gave it to Mr. Harvey. I received it back again indorsed by Mr. Folger's name and put it in my box. * * *

"As a matter of fact, I delivered all those shares of stock according to Mr. Harvey's directions. There was not much direction given me, but I was at all times willing to act in accordance with his suggestion. I never repaid Mr. Harvey the amount he advanced for assessments, because he never asked me. He said it was a gift along with the others. I never had any discussion with Mr. Fay in regard to the Shore Line Investment Company. Never spoke to him about it in my life. Mr. Harvey told me Mr. Fay was to manage at Granada. He never told me anything else about him. Mr. Harvey never asked me for possession of my stock so that he could deliver it to Mr. Fay. He never asked for the possession of the stock at any time except for Mr. Folger, and except that in 1909 he asked me for the stock again because there was a second assessment.

"Mr. Harvey told me that since I was the owner of the stock the bank absolutely demanded that I should sign the note. He said that since I was the owner and holder of the stock he deemed it advisable to have it put in my name, and therefore he had it put in my name. Up to that time he had always appeared on the books of the corporation as a stockholder. I always knew that the stock stood in Mr. Harvey's name on the books of the corporation, and was familiar with the fact that he was acting as president of the company and was managing its affairs. I was cognizant of the fact that there had been an assessment on the stock, but never made any offer to return that money to him."

This testimony was given on or prior to December 19, 1911. On January 5, 1912, she went on the stand again and testified, in effect, that she kept a safe deposit box at the First National Bank during the year 1905 and up until 1910, but that she had a safe of her own, with a combination lock, which she kept at her home at 2555 Webster street, San Francisco, Cal., and that she kept the stock in that safe and not in the safe deposit box at the bank, as she first stated. She changed safes in 1907, but always had a safe of her own and kept the stock in there. As to this she says:

"I did not have any shares of stock of the Shore Line Investment Company in that box during the year 1905. I made a mistake in my testimony, that is the reason I want to correct it. I never had any shares of stock of the Shore Line Investment Company in my box at any time. I kept that stock in my safe."

And further on she continues:

"On thinking it over I kept this stock in my own safe in my house."

In this relation it is of interest to note that Mrs. Harvey, at the instance of one of her attorneys, wrote a letter, of date December 19, 1911, to E. H. Williams, Esq., attorney for plaintiff, which was delivered to him by her husband under the following circumstances: One J. K. Moffitt was on the witness stand, and, when Mr. Williams began to question him in regard to the records of Mrs. Harvey's visits to the safe deposit vaults, Harvey handed the letter to Williams. She states in the letter, among other things:

"I do not myself know the exact dates of my visits (to the safe deposit box). I have of course been there a number of times since 1905; but I have at all times had a safe of my own wherever I have been living, whether here or at Monterey, and I kept many of my papers in those safes, and as I think it over I am positive I kept my certificates of stock there instead of in my

safe deposit box. * * * Should you or Commissioner Kreft wish me to correct my testimony in these particulars, I will of course do so gladly."

The letter was offered in evidence by plaintiff while Mrs. Harvey was on the witness stand.

This, in brief, is the substance of Mr. and Mrs. Harvey's testimony touching the alleged gift of this stock by Harvey to his wife in the year 1905, and with it, considering the corroborating and discrediting testimony otherwise adduced, Mrs. Harvey's title must stand or fall.

[1] In this relation we may pause to consider the point made by appellee that the alleged gift is in contravention of section 3440 of the Civil Code of the state of California, which provides that every transfer of personal property, with certain exceptions, is conclusively presumed, if made by a person having at the time the possession or control- of the property, and not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things transferred, to be fraudulent, and therefore void against those who are his creditors while he remains in possession, and the successors in interest, of such creditors. This statute received early construction by the Supreme Court of California in Stevens v. Irwin, 15 Cal. 503, at page 506 (76 Am. Dec. 500). The court says:

"A reasonable construction must be given to this language, in analogy to the doctrines of the courts holding the general principles transcribed into the statute. The delivery must be made of the property, the vendee must take the actual possession; that possession must be open and unequivocal, carrying with it the usual marks and indications of ownership by the vendee. It must be such as to give evidence to the world of the claims of the new owner. He must, in other words, be in the usual relation to the property which owners of goods occupy to their property. This possession must be continuous—not taken to be surrendered back again—not formal, but substantial. But it need not necessarily continue indefinitely, when it is bona fide and openly taken, and is kept for such a length of time as to give general advertisement to the status of the property and the claim to it by the vendee."

This construction, as we understand, has been uniformly adhered. to by that court. Bunting v. Saltz, 84 Cal. 168, 24 Pac. 167; Murphy v. Mulgrew, 102 Cal. 547, 36 Pac. 857, 41 Am. St. Rep. 200; McKee Stair Building Co. v. Martin, 126 Cal. 557, 58 Pac. 1044; Sequeira v. Collins, 153 Cal. 426, 95 Pac. 876.

[2, 3] Registration of a transfer of the stock upon the books of the corporation is not essential to a valid transfer of the title, and this even though the certificate recites that it is transferable only on the books of the company and a surrender of the stock. Nat. Bank of the Pacific v. Western Pacific Ry. Co., 157 Cal. 573, 108 Pac. 676, 27 L. R. A. (N. S.) 987, 21 Ann. Cas. 1391. In view of this holding, if the testimony of Mr. and Mrs. Harvey is to be credited, there was a complete and actual transfer by indorsement and delivery of this stock by the donor to the donee, and the donee has continued in the sole possession and dominion thereof with the two exceptions noted, which, in our judgment, does not break the continuity and good title vested in the donee. This, as we say, would be so if the parties to the transaction are to be credited. Of this we will now inquire.

It will conduce to the clarity of the situation by considering those:

things, and the testimony attending them, which go to the corroboration of the testimony of Harvey and wife separately from those that tend to discredit such testimony, or to a disparagement of Mrs. Harvey's title.

Mr. Burke Corbet, who was secretary of the Shore Line Investment Company and held the office since the company's organization, testifies that prior to the issuance of any stock to Harvey he had a discussion with Harvey as to how his stock should be issued; he then having indicated that he was buying the stock for his wife.

"I suggested," says the witness, "to him then that if this was true the stock should be issued in Mrs. Harvey's name. Mr. Harvey said that he preferred to have it issued in his own name because he wanted to be a director of the corporation, and wanted to participate actively in the management of the corporation. I told him at that time, and at a number of other times when subsequent stock certificates were issued in his name, that I thought the stock ought to be issued in the name of Mrs. Harvey, if she was the owner of the stock, and advised him at different times to that effect. At all of those times before any stock was ever issued in the name of Mr. Harvey, he stated to me that he had given the stock to Mrs. Harvey. After the stock was issued, we discussed it a number of times, and he told me he had given it to Mrs. Harvey."

Corbet further testifies that from the first to the last Harvey owned upon the books of the company 556 shares in all. The additional certificate for 10 shares went into his name on the books on June 1, 1909.

On April 13, 1907, an assessment was paid by Harvey upon the 546 shares of stock and appears upon Harvey's private books in this language: "April 13, 1907, to cash assessment No. 1, 546 shares at 10, $5,460."

As to this Mr. Wasserman, who was Harvey's bookkeeper from 1896 to the middle of 1908, testifies:

"At the time the assessment of the stock was paid—I do not know the exact date, but it would show in the book—I remember distinctly about asking Mr. Harvey about a receipt or entry for that assessment, and he told me that Mrs. Harvey (she, I think, was away at the time), that when she came back he would have the receipt entered on the stock. It was my habit, when Mr. Harvey paid an assessment, to have the receipt entered on the back of the stock. Mr. Harvey told me that Mrs. Harvey had possession of the stock at this time when the assessment was paid. This date was April 13, 1907. I made the entry on page 44 of Mr. Harvey's ledger showing the payment of the assessment."

Witness further testifies that during the time that he was in Harvey's employ he had full access to all compartments of his safe wherein he kept his stocks and bonds, save one which was held held by a friend of his, and went frequently to Harvey's safe deposit box, and during each year checked up his securities in the box; and that at the time of the San Francisco fire he went to his office, opened the safe, and gathered up all their securities that he thought were valuable, and took them to Harvey's home. One block of papers he carried around for some time in a wallet, being the same within which Harvey had his securities, insurance policies, and other valuable papers, and that he never saw any stock of the Shore Line Investment Company

in his custody, either in his office safe, in his safe deposit box, or at the time he took the securities to his home.

James W. Crosby, who was Harvey's bookkeeper from the spring of 1908, as he says, up to the time at which his testimony was given, testifies concerning assessment No. 1, alluded to by Wasserman, which appears on the books of Harvey as paid April 13, 1907, that at the time he was auditor and assistant secretary of the Shore Line Investment Company, and had a conversation with Harvey as follows:

"I do not remember the exact conversation, but he brought me a check in payment of the assessment. He told me at that time that it was to pay the assessment on Mrs. Harvey's stock, that Mrs. Harvey was away at the time and consequently he could not get the certificates, but he would bring them to me later to have the notation 'assessment paid' stamped or written on the back of the certificate. This was done at a later day. I do not recall how long afterwards. I do not recall Mr. Harvey's wording, but I understood that the stock belonged to Mrs. Harvey. I do not know whether he said the stock belonged to Mrs. Harvey in so many words or not. He told me the stock was Mrs. Harvey's at that time."

Mr. Charles W. Fay, who has held the position of general manager of the Shore Line Investment Company since January, 1906, testifies:

"I met Mr. Harvey very frequently. My business called me into consultation with him constantly, almost every day, and about that time he informed me— (Interrupted by objection.) Mr. Harvey told me at this time that this stock was Mrs. Harvey's. This was in 1906. I recall the circumstance of a negotiation with reference to paying off some indebtedness of the Shore Line Investment Company, in 1909. As general manager of the Shore Line Investment Company, I was authorized to negotiate for a loan to clean up this indebtedness. I negotiated with a certain banking institution here, and one of the conditions was that the stock of the various stockholders, or at least 90 per cent. of them, was called for, for the purpose of securing this loan. Also, that an agreement should be signed by the owners of the stock, holding themselves proportionately liable for the amount to be borrowed. I called on Mr. Harvey and asked him for the stock held in his name in this company, explaining my purpose. He said he would get the stock; that it was Mrs. Harvey's stock. I asked him how long it would be, and he said he would have to send for it; I believe that Mrs. Harvey was then at Del Monte. Two or three days subsequently I called on him and he gave me the certificates of stock standing in his name, indorsed. They did not remain so very long in my possession. I was collecting it for the trustee who was to hold the stock. I judge that it was either in my possession, or in his, for probably 30 days. The negotiations did not go through, and subsequent to that time there was an assessment levied on account of the demand of the French Bank for a payment on their loan. I gave the stock, I think, to Mr. Guggenheim, who was to hold this and the other stock. I do not recall whether I returned it to Mr. Harvey, or whether he got it back from Mr. Guggenheim direct."

Continuing on cross-examination, he further states:

"I first had physical possession of these shares of stock in October or November, 1909. I received them from Mr. Harvey."

Now, on the other hand, we may advert to such testimony as seems to be in disparagement of Mrs. Harvey's title, or that has a tendency to refute the testimony adduced in support thereof.

Harvey kept a set of private books, wherein were contained accounts of his private affairs, among which are to be found memoranda

under the head, "Family Gifts and Allowances." His individual account shows from the first—that is, from the date of the purchase of these shares of stock—until March 31, 1910, that they were posted to his credit, and not charged to "Family Gifts and Allowances." The entries with reference to the stock are beneath the numerals "1905," and are as follows, having allusion, no doubt, to the time of purchase:

| | | |
|---|---|---:|
| June 20. | To cash | $ 7,500 00 |
| Aug. 22. | To cash Fentin interest B. Corbet | 1,000 00 |
| Aug. 24. | To cash Fentin interest A. D. Bowen | 650 00 |
| Sep. 22. | To cash 170 shares at $50 | 8,500 00 |
| Sep. 26. | To cash 10 shares at $50 | 500 00 |
| | Total | $18,150 00 |

Then, as Wasserman says, for bookkeeping purposes this balance was brought down under date January 1, 1907. Then follows the entry: "April 13, 1907, to cash assessment No. 1, 546 shares at 10, $5,-460"—which amount added to the above balance aggregates $23,610.

Subsequently, under date of March 31, 1910, and under the heading, "Family Gifts and Allowances," appears this entry in the journal:

"To Shore Line Investment Company $23,610, transfer to Mrs. S. G. H. of S. L. stock. J. D. H. states this stock was originally purchased for Mrs. H."

Crosby says:

"I made this entire entry at my own volition, and not at the request of any person, but in accordance with the facts of which I was cognizant. It was about the time that Mr. Harvey's bankruptcy proceedings were pending, and he asked me to make up a statement for him during the time I kept his books." And "was made" as he further states "to wipe the amount off his books in accordance with a statement or request, made some time before, that I make a notation at the head of the account in the ledger covering the stock of the Shore Line Investment Company, that the stock did not belong to him. * * * He instructed me prior to March, 1910, to make an entry of this gift to Mrs. Harvey."

Wasserman testifies that at page 162—we take it that this is the ledger—under the caption, "Family Gifts and Allowances," appears this entry, "March 31, 1910, S. L. I. stock, $23,610," the caption being in witness' handwriting; and Crosby testifies:

"I made the entry on page 44 of Mr. Harvey's ledger reading, 'March 31st, 1910, F. G. & A. (meaning, Family Gifts and Allowances) 546 shares, $23,-610.'"

Harvey's trial balance book, made up by his bookkeeper, shows that in February, November, and December of 1906, and on February 1, 1907, the balance as to this stock standing to his account was $18,-150, and that on February 29, 1908, it was $23,610. This latter balance manifestly includes the assessment No. 1 of $5,460, although that item appears to be posted of date April 13, 1907. As to subsequent entries touching the account, Crosby, who seems to have made them, says:

"I entered in this trial balance book, referring to ledger folio 44, Shore Line Investment Company's stock, under date of October 31, 1909, on the debit side, $26,110, and under date of March 31, 1910, in the debit column of the same ledger folio and heading I entered $2,500. The trial balance of October 31, 1909, was the first that I took. The sum of $26,110 was the

balance shown in the ledger prior to the time that I made the entry transferring Mrs. Harvey's stock to the Family Gifts and Allowance account. The balance for $2,500 was the amount appearing in the ledger representing stock which Mr. Harvey himself owned."

This $2,500 item represented 10 shares of stock which went into his name on the books of the company June 1, 1909. These specific shares have gone into the hands of the trustee in bankruptcy.

In Harvey's cashbook, under date of September 9, 1905, appears in the handwriting of Harvey a pencil memorandum, opposite the words "Shore Line Investment Company," "Property of S. G. H." A like memorandum appears on each of pages 27, 35, and 41 of the cashbook. Also, another memorandum from the cashbook under date September 23, 1905, wherein the words, "Property of S. G. Harvey," appear written after the designation, "Shore Line Investment Company," also in the handwriting of Harvey, was introduced.

As further illustrative of entries under the heading, "Family Gifts and Allowances," we have the following:

1907. January 11. To cash, Mrs. Harvey..................... $200 00
January 28. To cash, Mrs. Harvey..................... 300 00
February 21. To cash, Mrs. Harvey, O. S. assessment
No. 3................................................. 500 00

—"O. S." meaning Ocean Shore Railway Company.

On September 22, 1907, manifestly at the instance of Harvey, Wasserman made up a statement of his affairs giving his liabilities and monthly interest charges; also, his monthly income, as well as a list of his properties and assets, showing his liabilities to be $745,944.37, and his assets, $1,383,287.47. Following a long list of properties. aggregating in estimated value $993,394.30, appears this statement:

"Besides the above, you should take into consideration the following:
"Due from Rogers for three assessments paid Ocean Shore stock secured by stocks and bonds, $13,420.00.
"Ocean Shore Railway Company, cash put in not including assessment No. 3, $283,613.17.
"Ocean Shore bonds given in payment Assessment No. 3, $55,000.00.
"Shore Line Investment Company, $23,610.00."

The letter advised careful study of the statement with a view to disposing of such of the assets as Harvey might be able to, and paying off the debts as fast as possible.

From Corbet's testimony it further appears that on December 20, 1906, certificate No. 30 for 66 shares of the Shore Line Investment Company's stock was surrendered and canceled, and on the same date a certificate for the same number of shares was issued to J. A. Folger. This was part of the 546 shares in controversy. These shares remained in Folger's name until December 19, 1907, when a new certificate, No. 70, was issued to J. Downey Harvey for the same number of shares.

Another item of testimony which may be mentioned is the memorandum made by Mrs. Harvey, and which was given in evidence purporting to give the date when received and number of shares of stock given her by her husband. It is as follows:

"300 shares delivered June 26th, 1905.
"On August 22, 1905, received 40 shares.
"On August 22, 1905, received 26 shares.
"On September 22, 1905, received 180 shares."

This memorandum was made up from slips which the witness says were made at the time, as was her custom, on the receipt of gifts, and was made up in response to a request of the court, the witness further saying, "At that time I used the slips I spoke of, afterwards destroying them." Further, the witness says, in another place, that, in making up the slips on receipt of the certificates, "I took the dates of the certificates and not the dates of their receipt."

Further, the testimony tends to show that Mrs. Harvey was in New York City about the date of June 26, 1905, and did not return until early in July, and that there were three admissions to her safe deposit box between June 1, 1905, and December 31st of the same year, which was in each instance by Lizzie Anderson, Mrs. Harvey's maid, namely, July 15, July 17, and November 8, 1905.

It is important to keep in mind what was done by Harvey in making the alleged gift to his wife. He, according to his own testimony, and that of Mrs. Harvey, indorsed his name upon the certificates of stock and handed them to her. But at the same time the stock was retained in his own name upon the stock books of the company and so carried the entire time up until November 26, 1909, when they were regularly transferred to her on such books, and a certificate was issued to her direct. Harvey's reason for so retaining the stock in his own name upon the stock books was that the success of the Shore Line Investment Company was dependent in large measure upon the building of the Ocean Shore Railroad, and he, being the largest stockholder in both companies, thought his association and prominence in each company would serve to help the other. But the possession of the stock certificates with the indorsement of Harvey's name thereon showing transfer of title, according to the testimony of Harvey and wife, passed to Mrs. Harvey about the date of the certificates. That Harvey intended giving this stock to his wife, and that he had given it to her, is shown by the evidence of reliable witnesses other than the parties interested. According to Mr. Corbet, Harvey told him at the time he was buying the stock that he was giving it to Mrs. Harvey, and then came up a discussion and suggestions as to how the stock should be issued. But Harvey preferred that it should be issued in his own name, because, as Corbet says, Harvey wanted to be a director of the corporation and to participate actively in its management. Wasserman, Harvey's bookkeeper for many years, has a distinct recollection that Harvey mentioned to him at some time that this stock was Mrs. Harvey's property. This is in relation to a receipt or entry for the assessment paid by Harvey, when Harvey told him that Mrs. Harvey was away at the time "and that when she came back he would have the receipt entered on the stock." Crosby, who became Harvey's bookkeeper later some time in 1908, says he was given to understand by Harvey that the stock belonged to Mrs. Harvey. He (Harvey) directed that certain entries be made in his books concerning such stock, which entries were accordingly made. But a significant

transaction occurred prior to the time that Crosby became Harvey's bookkeeper, and while he was assistant secretary of the Shore Line Investment Company, which had relation to the payment by Harvey of assessment No. 1 upon this stock. About the 13th of April, 1907, Crosby asked for the stock so that he might indorse the payment thereon, and Harvey told him then that the stock belonged to Mrs. Harvey, and that she was away at the time, but that he would get the certificates from her and bring them in and have the indorsement made. This was done later. Then Mr. Fay, who became manager of the corporation at the same time that Harvey became president, says that Harvey told him at the time, in 1906, that the stock was Mrs. Harvey's. A subsequent transaction tends strongly to substantiate Fay's statement, for, when he wanted Harvey to put the stock into third hands for the purpose of security, Harvey was unable to produce it until he obtained the same from his wife.

The testimony of these witnesses as it relates to what Harvey said about the stock can hardly be considered to be self-serving, for the statements he made to Corbet and Fay were at about or prior to the time that he delivered the stock to his wife, and evinced his purpose in that respect. First Nat. Bank v. Holland, 99 Va. 495, 39 S. E. 126, 128, 55 L. R. A. 155, 86 Am. St. Rep. 898. And what he said to Wasserman, Crosby, and Fay when it was desired that the stock be produced in the one case for indorsement of the assessment thereon, and in the other for placing the certificates in the hands of a third party for security purposes, was relevant and pertinent, as it related to a specific transaction when the presence or production of the stock certificates was required.

But Wasserman's testimony to the effect that he had full access to the depositaries where Harvey kept his stocks and bonds and securities of all kinds, and that he gathered together his papers and effects after the fire, and that he saw nothing of these stocks in all the time is very significant, as its strong tendency is to establish the pertinent fact that Harvey did not, during the time that Wasserman was his bookkeeper, have this stock in his possession.

The fact, as the testimony shows, that Harvey procured from his wife 66 shares of this stock, had a certificate issued to Folger for the same, had the same indorsed by Folger and returned to his wife, and afterwards had the stock transferred on the books to his own name, and then returned that stock, with his name indorsed on the certificate again to his wife, is but in keeping with his declaration from the first that he desired that the stock remain in his name on the books of the company, and is in harmony with what was done and designed to be done in the first instance. So of his procuring the stock from his wife at the instance of Mr. Fay for the purpose of using it for security purposes, and so also of his voting and signing the stock at stockholders' and directors' meetings of the corporation.

Concededly it is a strong circumstance against Mr. and Mrs. Harvey's claim that Harvey should have carried this stock on his private books as if it were his own, and so of the assessment No. 1, as if it had been paid by him individually and for his own account and not

for the account of Mrs. Harvey. We place no stress on the fact that Harvey made certain entries in his books in pencil indicating that the stock belonged to Mrs. Harvey. These are self-serving. It is true that manifestly his books were not scientifically kept, and it is sought to cast reflection upon his bookkeepers for the manner in which the stock account was so posted and carried as an asset of Harvey. But the bookkeepers were the agents of Harvey, and he must be chargeable with their delinquencies where not accompanied with fraud against him; and, further, he is presumed to know what is in his own books.

There are other entries in his books, however, relating to "Family Gifts and Allowances" account which would seem to indicate that there might have been a mistake on his part or that of his bookkeeper in not posting the stock to the account of Family Gifts and Allowances, or that it was not considered of particular importance that it should have been so posted. The stock was transferred to Mrs. Harvey on the books of the company on November 26, 1909. All are agreed as to this. Yet it is a fact that the asset was not transferred on Harvey's books, or charged to Family Gifts and Allowances until March 31, 1910. Then again, Harvey made a gift to Mrs. Harvey of a lot on Pacific avenue on February 28, 1905, at which date the deed was actually made to Mrs. Harvey; but the lot was carried on Harvey's books as his asset until July 31, 1905, and was not dropped from the trial balance book until December, 1905.

The letter of Wasserman adds emphasis only to the supposed fact that Harvey knew that the stock was being carried on his books as his individual asset. Another thing which seems to militate against the accuracy of Mrs. Harvey's testimony is the fact that she first testified that she kept this stock in her safe deposit box at the First National Bank. She so stated positively and unequivocally. But later she changed her testimony and affirmed that the stock was kept in her own private safe at her residence or where she lived elsewhere. This was a matter about which she may have made a candid mistake. Women are usually not so careful in business dealings as men, and ordinarily do not keep as strict trace of their business affairs as men do. And it might well be that Mrs. Harvey made her private safe the depositary of these bonds. Again, the memorandum of Mrs. Harvey touching the time when she received this stock seems to discredit her; but she explains by saying she used the date of the certificates, rather than the actual date when she received the stock, in making the record, and this reconciles the receipt of the first 300 shares with the fact that she was probably away in New York on the date of its issue. The memorandum which was put in evidence was made up in response to the request of the court. She then destroyed the original slips.

Now, upon this record, what are we to say is the fact as to whether Harvey gave this stock to his wife? Harvey affirms that he indorsed and delivered the stock with the intent and purpose of giving it to her, and Mrs. Harvey affirms that he did not only indorse and deliver the stock to her, but that she received it and accepted the same as a gift, and that she has continued in the actual possession and dominion ever since. As we have indicated, the retaining of the stock in Har-

vey's name upon the stock books of the company was in harmony with his primary purpose so that he could continue as a director of the corporation. This casts no discredit upon his statement touching what was done in making the gift; and, while the stock was carried upon his private books as an asset of his own, we think it does not destroy the verity of his statement respecting the initial fact of indorsing and delivering the stock as a gift to her. We are still bound to believe what he said as to that, and what his wife said as to it. The manner in which he carried the stock on his private books tends, undoubtedly, to an impairment of the credit of his statements as to the gift, because inconsistent therewith; but, when all the attending circumstances are considered, we are convinced that the statements are true notwithstanding, and that the book entries were not made because he considered the stock his own, but most likely because he deemed it in consonance with the fact that the stock stood in his name upon the stock books.

At the time of the indorsement and delivery of the stock to Mrs. Harvey, Harvey was entirely solvent, and could have had no motive whatever for covering up or concealing his property, or any of it, from his creditors. He remained solvent for a long while thereafter, so that no ulterior purpose can be ascribed to his action at that time.

But a gift once made cannot be recalled without the consent of the donee, and what Harvey may have done by way of book statements as to the asset subsequently could not affect Mrs. Harvey's title. Nor do we think that he so intended to affect her title, nor in any way to withdraw or modify his primary purpose of giving her the stock; nor is it a fact established in any way that Mrs. Harvey held the stock subject to Harvey's dictation or control.

It is true, as is said in Bauernschmidt v. Bauernschmidt, 54 Atl. 637–643:

"There can be no gift which the law will recognize where there is reserved to the donor, either expressly or as a result of the circumstances and conditions attending the transaction, a power of revocation or a dominion over the subject of the gift. There can be no locus penitentiæ, and there is always a locus penitentiæ where the supposed donor may at any moment undo what he has done."

But there is no such element in this case. Mrs. Harvey's testimony that she received the stock from Harvey, and that she continued in the sole possession with the two exceptions mentioned, we think must be taken as the true statement of the fact. She first thought that she kept the stock in her safe deposit box at the bank, but she was afterwards convinced that she kept it in her own private safe—a lapse of memory. But the crucial fact remains that she had and continued in the sole possession, no matter where she kept it. Her private safe was provided with a combination lock, and her husband did not have access to the safe. The stock was as much under her dominion in that safe in her own home secure from the intrusion of her husband as it would have been in the safe deposit vault, and it was secure from his control or dominion in either event. The further discrepancies in Mrs. Harvey's narrative which have been heretofore noticed

are of no greater moment than often happens with perfectly truthful and candid witnesses. Mrs. Harvey's memory, she admits herself, is not always to be trusted. But the corroboration that her testimony has received we think so fortifies the statements as to the material and potential fact that she received the stock as a gift from her husband and continued in the actual possession and dominion of the same until surrendered for exchange on November 26, 1909, for another certificate as to render them entirely worthy of belief. We cannot think that Mr. and Mrs. Harvey deliberately and corruptly devised the story about what took place, and that they have sworn falsely for the sake of saving this stock from the wreck of Harvey's business affairs for the wife's benefit.

We therefore conclude that the decree of the court below should be reversed and the cause dismissed.

We have not overlooked the rule invoked by counsel for appellee that the finding of the chancellor or the trial court upon conflicting evidence is presumably correct. In this case, however, not all the evidence was taken in open court. Indeed, the principal part of Mrs. Harvey's evidence was taken before the referee and read upon the trial. We think, however, that a serious mistake was made by the trial court in giving undue importance to the carrying of the stock in Harvey's name on the stock books, to the minutes of the corporation meetings, and to Harvey's private books, and that the strong weight of the testimony is against its findings.